

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| STEPHEN A. BERGENHOLTZ, | § | Case No. 12-41074 |
| | § | (Chapter 7) |
| Debtor. | § | |

### MEMORANDUM OPINION REGARDING JOSEPHINE DONNA ESKENAZI'S EMERGENCY MOTION FOR CONTEMPT [Docket No. 48]

This matter is before the Court on the motion by Josephine Donna Eskenazi to find her ex-husband, the debtor in this case, in contempt for his alleged vandalism of their former marital home after this Court ordered him to vacate it.  The debtor converted his case to chapter 7 on the eve of the hearing on Mrs. Eskenazi's motion.  Accordingly, Mrs. Eskenazi also seeks to establish that "cause" exists for this Court to order that the original petition date remains the petition date in the debtor's converted case so that the debtor cannot obtain a discharge of his liability for his post-petition conduct.

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§1334(a) and 157(a), and the United States District Court for the Eastern District of Texas' Order of Reference of Bankruptcy Cases and Proceedings *Nunc Pro Tunc*.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

The Court heard Mrs. Eskenazi's motion on November 16, 2012, November 30, 2012 and January 14 - 15, 2013.  At the conclusion of the hearing, the Court scheduled the matter for a later ruling.  The Court delayed announcing its ruling at the parties' request while they explored a global settlement of their claims against each other.  The parties, however, announced on the record on July 9, 2013, that they were unable to reach an amicable resolution of their various disputes.  The Court, having considered Mrs.

Eskenazi's motion for contempt and the debtor's opposition, and having considered the testimony and other evidence presented at the hearing on the motion, makes the following findings of fact.

## FINDINGS OF FACT

1.      The present dispute concerns the former marital home of Mrs. Eskenazi and the debtor located on Bryers Circle in Plano, Texas (the "House").  The debtor built the House approximately 17 years prior to filing for bankruptcy.

2.      The debtor and Mrs. Eskenazi began divorce proceedings in 2008.  They had two minor sons at that time.  The debtor and Mrs. Eskenazi agree that the divorce proceedings were protracted and bitter.  Mrs. Eskenazi continued to live in the House until November 2009.  In or around November 2009, Mrs. Eskenazi moved out of the House, and the debtor moved into the House, pursuant to the orders of the state court.

3.      In summary terms, pursuant to various agreements and orders entered in state court litigation pertaining to their divorce, the state court awarded Mrs. Eskenazi a judgment for $1.1 million against the debtor, and the debtor was required to sell the House and pay 100% of the proceeds to Mrs. Eskenazi.

4.      On April 20, 2012 – after the debtor failed to vacate the House as required by the orders of the state court – Mrs. Eskenazi filed her Emergency Motion to Order Sheriff to Physically Remove Respondent and/or Inhabitants from Property (the "Eviction Motion").  The Eviction Motion was set for hearing on April 24, 2012.

5.      On April 24, 2012, Debtor initiated a chapter 13 proceeding in this Court.

2

6. Mrs. Eskenazi promptly requested relief from the automatic stay imposed by § 362(a) of the Bankruptcy Code so that she could enforce the state court orders, take possession of the House, and realize her equitable interest in the House.

7. On July 16, 2012, this Court entered an Agreed Order Granting Josephine Donna Eskenazi's Motion for Relief from Automatic Stay to Proceed with Enforcement of Orders in the Divorce Proceeding (the "Lift Stay Order"). The Lift Stay Order provided, *inter alia*, for the debtor to vacate the House so that a state court receiver could take possession of the House and sell it for the benefit of Mrs. Eskenazi.

8. The Lift Stay Order allowed the debtor to remove his personal property from the House prior to vacating the property. The Lift Stay Order expressly provided that the debtor "shall remove any personal property" and "shall not remove any fixtures from the House."

9. The debtor testified that he understood the language in the Lift Stay Order to mean that he could do anything he pleased with anything at the House that he determined in his own judgment was not a fixture.

10. The debtor authorized a person known to him as "Eddie" to remove the large, stone steps from the front of the House as well as the motorized gate to the back yard in September 2012, supposedly in payment of a pre-petition, unsecured debt.

11. In addition, after filing for bankruptcy, the debtor conducted four or five garage sales, where he sold various items he removed from inside the House such as the dishwasher and microwave. He did not receive authority from this Court for a post-petition disposition of estate assets or report the yard sale income in his bankruptcy case.

12. The debtor formally vacated the House on Friday, October 2, 2012.

3

13.     The testimony of the Mrs. Eskenazi's expert, James Spalding, was highly credible with respect to the nature and extent of the damage the debtor inflicted on the House before leaving.

14.     The testimony of Officer Mills from the Plano Police Department corroborated the damage to the House described by Mr. Spalding.   Officer Mills' testimony was highly credible.   His testimony also established that most of the damage occurred at or around the time the debtor vacated the House.   Several burn barrels were still smoking in the back yard when Officer Mills' visited the House, and the fireplaces were filled with ashes and debris, which spilled across the floor of the House.

15.     Grady Thompson, the state court receiver appointed to take over and sell the House, visited the House within a few days after the debtor left.   He was at the House for approximately an hour.   His description of the damage to the House corroborated the testimony of Mr. Spalding and Officer Mills.

16.     Mr. Thompson testified, credibly, that the City of Plano threatened to fine him for various City Code violations at the House as a result of the damage to the House inflicted by the debtor.

17.     The Court finds, based on the credible evidence presented at the hearing, that the debtor intentionally damaged the House after the Court entered the Lift Stay Order.   Among other things, and as described more fully below, the debtor cut electrical wiring inside the air conditioning system unit.   The debtor caused the removal of the gas and electrical meters, cut plumbing and gas lines, filled the gas line to the House with rocks, and put concrete and nails in the drain of an in-ground pool behind the House.   He demolished the gazebo in the backyard near the pool.   He cut up the decorative iron fence

around the pool as well as a decorative iron railing on an upstairs balcony.[1]  He removed the built-in speaker system from the family room by ripping the speakers from the walls. He removed the plates from light switches and cut the wires behind the plates.  In addition, he removed the built-in microwave and dishwasher, removed and destroyed kitchen cabinet doors, removed the locks from all or nearly all of the windows in the House, stopped up the sinks and toilets, and spray painted doors.

18.    The debtor's testimony that he demolished the gazebo because he believed it violated the Plano City Code was not credible.  The debtor's testimony that he removed the locks from the windows prior to the entry of the Lift Stay Order also was not credible.

19.    The debtor's attempted justification for some of the damage – that some of the items he destroyed or sold were no longer working or in poor condition – may go to the monetary amount of damage, but does not alter the fact that he deliberately destroyed estate property.

20.    The debtor testified that he left his son alone to live in the House for several days before he formally turned over the House to the state court receiver on October 2, 2012.  The debtor had already damaged the House by the time his son arrived. His son testified that there was no power or gas to the House.  The debtor's son testified that he used a power generator while he stayed alone in the House for several days.  The debtor's son testified that he and his friends had a party in the House and that he told his friends he didn't care what they did to the House.

---

[1] At the hearing, the debtor complained that some of the photos of the damage he inflicted on the House were fabricated because, for example, the individuals taking the photo of the decorative iron railing on the on the upstairs balcony held the railing so that the Court could see where it had been cut.  The debtor's objection to the evidence is without merit.  The witnesses did not falsify any evidence or exaggerate any of the damage to the House.

21.     The debtor's son testified, credibly, that he removed a brick from the patio area of the House because he was angry at his mother.  He also testified, credibly, that he wrote an angry note for her and left it on a wall of the House.

22.     In general, however, the story told by the debtor's son was not credible. On cross-examination, he was uncertain about the dates, times and even the months when events occurred.

23.     Even if the debtor's son testified truthfully about the damage he and his friends did while he hosted a party or parties in the House, his father failed to supervise him, and his father was responsible for the condition of the House until October 2nd, when it was turned over to the state court receiver.

24.     The debtor presented the testimony of Michael Saulino, a contractor who had worked on the House in the past, in support of his assertion that the House was in poor condition when he moved back into it in November 2009.  Mr. Saulino testified that he first visited the House in 2009 and that he had last visited the House in May 2012. The debtor also presented the testimony of John Johnson, who inspected the House in March 2012.

25.     The testimony of the debtor, Mr. Saulino, and Mr. Johnson established that the debtor did an amateurish job of installing the electrical wiring in the House when he built it.  Their testimony also established that he had done little or no maintenance on the House between 2009 and 2012.   More particularly, the in-ground pool needed intensive refurbishing even before the debtor clogged the drain with concrete and nails. The metal fence around the pool was rusty and in need of repairs.  The fountain in the front yard, the sprinkler system, and the landscape lighting were not working.  The House

also suffered from significant foundation problems, water damage on the floors and ceilings, and the interior of the House needed to be repainted.  There was a broken mirror in the surround near one of the fireplaces.  The electrical wiring throughout the House was deficient, and the television, computer and smart system needed to be rewired.  Doorways and trim needed repair due to "impact damage" and dog damage.  Various light bulbs needed to be replaced, and some of the window blinds were damaged.

26.     While the testimony of Mr. Saulino and Mr. Johnson established that the House suffered from deferred maintenance, their testimony also corroborated the testimony of Mrs. Eskenazi's witnesses that most of the damage to the House for which she seeks sanctions occurred after May 2012.

27.     While the House was not in perfect condition on his bankruptcy petition date, the debtor's post-petition acts of destruction made the House uninhabitable.  The House was not in a condition to sell to an ordinary homeowner when the debtor turned over the House to the state court receiver.  Due to the damage inflicted by the debtor, the City of Plano threatened the receiver with citations for various City Code violations.

28.     Mr. Thompson and his real estate agent marketed the House to investors through Ebby Halliday.  Within several weeks, Mr. Thompson sold the House for a gross price of $225,000.  It is not clear from the record how much the receiver would have received for the House had the House been in marketable condition.

29.     The debtor contended at the hearing that he had offered to fix some of the damage he did to the House that led to citations from the City of Plano.  He argued that the receiver should have allowed him to mitigate the damage.  The debtor, however, was in bankruptcy at the time and did not have the funds or resources to repair the House.

7

30.     Mrs. Eskenazi estimated that the actual cost of addressing the some of the deferred maintenance issues and repairing the damage the debtor inflicted upon the house was $61,660 plus a 10% contingency plus a 15% mark-up for the contractor for a total estimated cost of $77,993.

31.     At trial, Mrs. Eskenazi established that the debtor deliberately inflicted, or allowed his son to inflict, the following damage to the House before turning over the House to the state court receiver.  The debtor:

   (a)   removed the front sidewalk steps;
   (b)   damaged the stone retaining wall around the front of the House
   (c)   removed a fireplace cabinet door, screens, and a gas valve fixture;
   (d)   cut the gas line in the laundry room;
   (e)   destroyed the central vacuum system;
   (f)   destroyed the security and smart system;
   (g)   broke several windows;
   (h)   clogged the toilets;
   (i)   violently removed ceiling speakers throughout the House;
   (j)   broke or removed cabinet doors and shelves throughout the House;
   (k)   removed the locks on all the windows;
   (l)   cut internal wires on one of the air conditioning systems;
   (m)   cut plumbing lines;
   (n)   removed the automatic gate for the driveway;
   (o)   destroyed the pergola near the pool;
   (p)   knocked holes in the walls and ceiling and spray painted the walls;
   (q)   poured concrete and nails into the pool drain;
   (r)   removed the iron fence and gate from around the pool;
   (s)   cut the handrail on the interior stairs in three places;
   (t)   removed the dishwashers and sold them;
   (u)   cut the gas meter lines and filled the lines with rocks; and
   (v)   cut and removed electrical wiring throughout the House.

32.     When he filed for bankruptcy, the debtor estimated the value of the House at $377,000.  This value was based on an appraisal of the House's market value dated May 29, 2012, and the appraisal assumed that the debtor would repair the roof, the foundation, the interior walls, the interior and exterior paint, and that he would bring the heating and cooling systems up to the Plano City Code.  Three weeks after he filed his

original bankruptcy schedules, he amended his schedules to reduce the estimated value of the House to $239,000 based on the "as is" value included in the May 29th appraisal.

33.     Mrs. Eskenazi filed a motion to convert the debtor's case to chapter 7 and for damages for the debtor's contempt of this Court on October 26, 2012.  The Court scheduled a hearing to be held on November 16, 2012.  On November 14, 2012, the debtor filed his own notice of conversion, and the Court converted his bankruptcy case to chapter 7.  The debtor's chapter 7 trustee is Mark Weisbart.

34.     The Court finds, as a matter of fact, that the debtor converted this case in bad faith for the purpose of discharging his obligation for the damages he caused to the House during the pendency of his chapter 13 bankruptcy case.

## CONCLUSIONS OF LAW

1.     Section 105(a) confers civil contempt power on bankruptcy judges. *Placid Ref. Co. v. Terrebonne Fuel & Lube, Inc. (In re Terrebonne Fuel & Lube, Inc.),* 108 F.3d 609, 613 (5th Cir. 1997); *In re All Trac Transp., Inc.,* 306 B.R. 859, 874 (Bankr. N.D. Tex. 2004).  In a civil contempt proceeding, the movant must establish "'by clear and convincing evidence: (1) that a court order was in effect, (2) that the order required certain conduct by the alleged contemnor, and (3) that the alleged contemnor failed to comply with the court's order.'"  *American Airlines, Inc. v. Allied Pilots Ass'n.,* 228 F.3d 574, 581 (5th Cir. 2000).

2.     Here, the Lift Stay Order was in effect at all relevant times.  The Lift Stay Order authorized the debtor to remove his personal property and expressly prohibited him from removing any fixture from the House.  The debtor argued at the hearing that

*destroying* fixtures or merely *damaging* fixtures did not violate the Lift Stay Order and, therefore, he did not act in contempt of this Court's Lift Stay Order.[2]

3.      As an initial matter, the debtor's duties under the Lift Stay Order must be interpreted in light of his statutory duties to maintain and safeguard property of the estate. Upon the filing of his chapter 13 bankruptcy petition, the debtor was vested with same rights, and subject to the same limitations, as those given to a chapter 7 trustee with respect to the sale, use and lease of estate property.  *See* 11 U.S.C. § 1303.  The debtor was "accountable for all property received," *see* 11 U.S.C. §§ 704(2), had the duty to maximize the value of the estate, *see* 11 U.S.C. § 704(1), and had a " 'duty to protect and conserve property in its possession for the benefit of creditors.' "  *In re Marvel Entm't Group, Inc.,* 140 F.3d 463, 474 (3d Cir. 1998) (quoting *In re Ionosphere Clubs, Inc.,* 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990)).

4.      The debtor is asking this Court to interpret the Lift Stay Order as allowing him to damage and destroy estate property in violation of his statutory duties.  The debtor argues that the Lift Stay Order did not prohibit damage or destruction of estate property, but only the removal of fixtures.  A party's compliance with a court order cannot be avoided by "a literal or hypertechnical reading of an order," for it is "the spirit and purpose of the injunction, not merely its precise words, that must be obeyed."  *National Research Bureau, Inc. v. Kucker,* 481 F.Supp. 612, 615 (S.D.N.Y. 1979).  Further, the

---

[2] The debtor also suggested that he could not be held in contempt of the Lift Stay Order, because it was an agreed order.  "An agreed order, like a consent decree, is in the nature of a contract, and the interpretation of its terms presents a question of contract interpretation." *Thomasville Furniture Indus., Inc. v. Elder–Beerman Stores,* 250 B.R. 609, 635 (S.D. Ohio 1998).  *See also In re 360 Inns, Ltd.,* 76 B.R. 573, 578 (Bankr. N.D. ex. 1987) ("[A]n agreed order is in the nature of a contract and is subject to the rules of construction of contracts.").  An agreed order is nonetheless an order of the Court and violations are punishable as contempt.  *See U.S. v. Sorrells,* 877 F.2d 346, 350 (5th Cir. 1989) (affirming the district court's contempt order after the defendant failed to comply with an *agreed* order compelling discovery and could not produce credible evidence establishing that compliance was impossible).

Court's interpretation of the Lift Stay Order should harmonize the debtor's statutory duties with the terms of the Lift Stay Order.

5.      Here, if there was any ambiguity in the Lift Stay Order, it is no excuse for the debtor to make an ad hoc interpretation to determine its meaning.  The debtor had an *affirmative duty* to petition for a clarification, modification, or construction of the Lift Stay Order before performing acts in the ambiguous area.  *See Nasco, Inc. v. Calcasieu Television & Radio, Inc.,* 583 F.Supp. 115, 120 (W.D. La. 1984) (quoting *National Research Bureau, Inc. v. Kucker,* 481 F.Supp. 612, 615 (S.D.N.Y. 1979)).  The debtor clearly made no attempt to pursue this course of action.  Instead, he liberally interpreted what he believed might be personal property, and what he could do to fixtures, for the purpose of doing as much damage to the House as he could.

6.      The Court finds and concludes that the debtor acted in contempt of this Court's Lift Stay Order by willfully and deliberately damaging the House before turning it over to the state court receiver.  He also acted in violation of his statutory duties, and in contempt of this Court's Lift Stay Order, by giving away, selling or bartering items he removed from inside the House.

7.      "Civil contempt orders serve either or both of two purposes: (1) to compel or coerce obedience of a court order; and (2) to compensate parties for losses resulting from the contemptor's non-compliance with a court order."  *In re Haddad,* 68 B.R. 944, 952 (Bankr. D. Mass. 1987) (citing *United States v. United Mine Workers of America,* 330 U.S. 258, 303–04 (1947)).

8.      "In a civil contempt proceeding, a monetary sanction, assessed for the purpose of compensating the complainant for losses sustained by reason of the

contemnor's acts, is within the universe of permissible sanctions. Thus, make-whole relief is a commonplace sanction in civil contempt. So too are normal embellishments such as attorneys' fees and costs." *Goya Foods, Inc. v. Wallack Mgmt. Co.,* 290 F.3d 63, 78 (1st Cir. 2002). *See also Halderman v. Pennhurst State School & Hosp.,* 49 F.3d 939, 941 (3d Cir. 1995) (fee award in contempt context is designed to make party whole for losses incurred as result of contempt).

9.     The evidence presented at the hearing on Mrs. Eskenazi's motion establishes that the debtor inflicted damage on the House despite the Lift Stay Order that merely allowed him to remove his personal property before leaving. The debtor also used items he removed, or allowed to be removed, from the House to pay pre-petition claims against his estate. The damage he inflicted was real and substantial. The Court concludes that an award of $50,000 appropriately compensates Mrs. Eskenazi for the damage to the House inflicted by the debtor.

10.     Mrs. Eskenazi is also entitled to her reasonable attorneys' fees. The Court will award attorney's fees upon consideration of an application by her attorneys for their fees through the date of this ruling. A separate order will be entered upon that submission, and the judgment rendered will incorporate that award.

11.     The Court now turns to the question of whether the petition date or the conversion date should be the date of the "order for relief." Pursuant to § 727(b), a debtor is generally discharged from all debts that arose before the order for relief. When a case is converted, § 348(b) fixes the date of the "order for relief" in § 727(b) as the date of conversion. Thus, as a general matter, a debtor is discharged from all claims arising before the date of conversion. Section 348(b) allows a court, however, to choose a

12

different date from the date of conversion as the operative date for the order for relief, but only "for cause" shown.

12.     The term "cause" is not defined in the Bankruptcy Code.  This absence "leav[es] courts to consider what constitutes cause based on the totality of the circumstances in each particular case."  *In re Wilson,* 116 F.3d 87, 90 (3d Cir. 1997).  In *In re Morris*, the bankruptcy court equated "cause" to a showing of "bad faith."  *Id.* at 426.  It framed the issue thusly: "The question is whether the [two] conversions were in bad faith and for the purpose of discharging the post-petition gambling debts."  *Id.* at 430.

13.     Here, the debtor filed for bankruptcy on the eve of an eviction from his House.  He subsequently agreed to vacate the House, but inflicted extensive damage on the House before doing so.  He also, by his own admission, removed items from the House and disposed of them without requesting or receiving this Court's authority.  The debtor destroyed estate property in order to hinder or delay a creditor, namely, his ex-wife.  After his ex-wife moved to convert his bankruptcy case to chapter 7 and for an order holding him in contempt, the debtor filed a notice voluntarily converting his case.  The debtor converted his case in bad faith and for the purpose of obtaining a discharge of his liability for the damage he inflicted on the House after filing for bankruptcy.

14.     For all the foregoing reasons, the Court concludes that the debtor converted his case to chapter 7 in bad faith and that cause exists to order that the petition date in this case will remain the date the debtor filed his original chapter 13 petition.

## CONCLUSION

In summary, the Court finds and concludes that the debtor acted in contempt of this Court's Lift Stay Order.  The Court is awarding sanctions of $50,000 to Mrs.

Eskenazi plus her reasonable attorneys' fees.  The Court further finds that "cause" exists under §348(b), and the order for relief will remain the original petition date, which was April 24, 2012, for purposes of §727(b), among other things.  Counsel for Mrs. Eskenazi shall file a request for their reasonable attorneys' fees within 14 days of the entry of this memorandum opinion.

Signed on 7/10/2013

HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE